**Reuben PALMER, et al., Subclass A Plaintiffs,**

**and**

**Edward Negron, et al., Subclass B Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al., Defendants.**

No. 82 C 2349.

United States District Court, N.D. Illinois, E.D.

March 31, 1983.

Order April 27, 1983.

be appropriate." 42 U.S.C. § 2000e–5(g) (1976).

Jeffrey H. Haas, G. Flint Taylor, Dennis Cunningham, Michael E. Deutsch, Chicago, Ill., for plaintiffs.

Robert L. Janega and Robert W. Fioretti, Asst. Corp. Counsel, Chicago, Ill., for city defendants.

Henry A. Hauser, Deputy Chief, Civ. Action Bureau, Chicago, Ill., for county defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Two sets of plaintiffs have filed this class action seeking, among other relief, a preliminary injunction. This Court has conducted an evidentiary hearing on the motion for preliminary injunctive relief. In accordance with Fed.R.Civ.P. ("Rule") 52(a) this memorandum opinion and order reflects this Court's findings of fact and conclusions of law. To the extent (if any) that matters stated in the "Conclusions of Law" section of this opinion contain factual statements, those statements shall be considered findings of fact as well. For the reasons stated in this opinion, plaintiffs' motion for a preliminary injunction is granted.

*Findings of Fact ("Findings")*
*Parties and Proceedings*

1. On April 16, 1982 plaintiffs filed this class action under 42 U.S.C. § 1983 ("Section 1983") on behalf of two subclasses of persons arrested by the Chicago Police Department and charged with felonies under Illinois law:

(a) those persons convicted of criminal offenses in the Circuit Court of Cook County and sentenced to probation or imprisonment ("Subclass A"); and

(b) those persons awaiting trial in the Circuit Court of Cook County ("Subclass B").

Defendants in this action are:[1]

(c) "City Defendants": City of Chicago ("City"), Superintendent of Police Richard Brzeczek ("Brzeczek") and Detective Division Area 2 Commander Milton Deas ("Deas"); and

---

1. On October 24, 1982 this Court granted County Defendants' Motion To Dismiss the damage claims against the prosecutors named in plaintiffs' Amended Complaint (the "Complaint") and dismissed the State's Attorney's Office of Cook County because it was not a suable entity. For the same reason the Chicago Police Department is also dismissed as a defendant.

(d) "County Defendants": Cook County State's Attorney Richard M. Daley and various of his deputies and assistants: Chief Deputy William Kunkle ("Kunkle"), former Assistant in charge of the Felony Review Division Lawrence Hyman, and Assistants Daniel Locallo and James Varga.

2. Immediately on filing this action plaintiffs moved for an emergency temporary restraining order ("TRO") before the Honorable Thomas McMillen, to whom the case was originally assigned. After hearing arguments from all parties, on April 20, 1982 Judge McMillen issued a TRO that provided in part:

Defendants shall preserve all police department investigative office or working files, sometimes known as "street files," together with all contents of such files....

That TRO took effect upon plaintiffs' filing of the required bond April 26, 1982. By agreement of the parties, the TRO has been continued beyond its ten-day limitation and, as amended, still remains in force and effect.

3. In September 1982, after all parties had engaged in discovery, plaintiffs moved to amend the TRO, claiming (a) Chicago police detectives were violating both the letter and spirit of the TRO by maintaining investigative writings and files as their personal property and (b) that practice had been adopted and was being carried on to avoid the mandate of the TRO for preservation of such writings and files. On September 24, 1982 Judge McMillen amended the TRO to provide (emphasis added):

Defendants shall preserve intact all police department investigative, office or working files, *sometimes* known as "street files," together with all the contents of such files, and all other papers and documents *formerly put in such files....*

4. Shortly thereafter this action was transferred to the docket of this Court,

which promptly scheduled and thereafter held a hearing on plaintiffs' motion for a preliminary injunction.[2] That hearing took place October 25–27 and 29, 1982 and (after a delay occasioned by the nature of Brzeczek's testimony—see Finding 18) was concluded January 3, 1983. All the remaining Findings are based on the evidence adduced at the hearing.

*City and County Defendants' Practices and Procedures*

5. City's Police Department ("Department") is responsible for investigation of crimes occurring within City and for apprehension of persons who commit such crimes. Department comprises the following Bureaus: Technical Services, Field Tactical Services, Community Services, Administrative Services, Operational Services and Investigative Services. Its Detective Division, within the Bureau of Investigative Services, is administratively divided into six geographical Areas, each headed by an Area Commander directly subordinate to a Deputy Superintendent. Each Area detective facility contains an Administrative Unit, a Property Crimes Unit and a Violent Crimes Unit.

6. Violent Crimes Units are responsible for the investigation of crimes against the person, such as homicide, rape, kidnapping, battery, robbery and assault. Members of Subclasses A and B have been charged with offenses as the result of such investigations.

7. Detectives investigating the types of crimes described in Finding 6 record the results of their investigations in documents that may be classified in two categories, "Unofficial Reports" and "Official Reports":

(a) "Unofficial Reports" comprise documents usually prepared contemporaneously with the obtaining of the information (such as detectives' notes, typed witness statements or interviews, and major crime incident worksheets, normally prepared at the initiation of an investiga-

**2.** Judge McMillen had also contemplated holding such an early hearing but then became the transferee of another action (from which this Court had recused itself) that required similar expedited scheduling. This action was transferred to this Court in exchange for that other action.

tion) and documents that convey information to or request assistance from another shift of detectives working on the same investigation (such as "To-From Memos," "To All Watch Memos" and "Memos").

(b) "Official Reports" comprise standardized incident, opening, supplementary and closing reports.

Only the Official Reports were and are marked with the Records Division ("RD") number assigned to an investigation and were and are transmitted from the Area detective facility to the Records Division at Police Headquarters, 1121 S. State Street, for storage in the correspondingly numbered file.

8. Department has never provided its detectives or other personnel with directives or guidelines as to the extent to which Official Reports had to embody material obtained in the course of investigations and reflected in Unofficial Reports. City Defendants contend (Prop. Finding 17):

> At all times relevant hereto the policy of the Chicago Police Department has been that all official reports prepared in the course of a violent felony investigation must be complete and accurate; that is, such reports must contain all information known to the preparer(s) which pertains to the offense or to the person(s) accused thereof.

In practice, however, Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that—though highly relevant and sometimes exculpatory of the defendant charged with the offense—the preparer does not deem "pertinent."[3] Retention of Unofficial Reports is essential so that all exculpatory material may be made available to criminal defendants in the regular course of dis-

covery procedures. Consequently any failure to retain Unofficial Reports creates a serious potential of deprivation of defendants' constitutional rights. Such deprivations have in fact occurred in the past and were the subject of testimony during the hearing.

9. Existence of Unofficial Reports was well known throughout Department before the institution of this action.[4] However, before the promulgation of Detective Division Notice 82–2 ("Notice 82–2") on April 20, 1982:[5]

(a) Department took no official cognizance of and had no official policy concerning Unofficial Reports.

(b) There was no uniform practice within Department as to the preparation, retention, use or storage of Unofficial Reports.

Unofficial Reports were regularly maintained at the Areas' detective facilities during the course of an ongoing investigation. Files containing Unofficial Reports during the course of investigation are variously referred to as "street files," "running files," "office files" or "working files" (for convenience these Findings and Conclusions will use the term "street files"). Because of the absence of any official policy or uniform practice:

(a') At one Area headquarters Unofficial Reports were kept in a joint file with the Official Reports, while in others they were maintained in a separate file.

(b') In some Areas and on some watches Unofficial Reports were considered the property of the individual detective, who could maintain them in his personal possession and retain them or discard them as he wished.

(c') In what appear to be a significant number of cases the Unofficial Reports

---

**3.** As Department's Area 3 Commander John Stibich acknowledged in this context on cross-examination, "What's pertinent to one [detective] might not be to another."

**4.** Indeed, there is nothing inherently wrong in *maintaining* such documents, which are a useful adjunct to the investigative process. What has created the potential for, and actuality of, deprivation of criminal defendants' constitu-

tional rights has been the *non-disclosure* of the existence of such Reports and of the exculpatory material they contain, coupled with the lack of procedures assuring their *preservation*.

**5.** Notice 82–2 was generated in response to the institution of this action and Judge McMillen's issuance of the TRO referred to in Finding 2.

were destroyed, sometimes upon the submission of a closing report, sometimes upon completion of the prosecution and sometimes after appeal.

10. In addition to materials contained in the street files, other types of police reports are not given RD numbers and are not kept in the Central Record Division. Those include crime lab notes and writings, which are placed in files with crime lab rather than RD numbers. Similarly investigative reports generated at the Central Records Division, such as reports concerning internal investigations and firearm use reports, are not given RD numbers.

11. As a result of the procedures described in the preceding Findings, not all potentially exculpatory[6] information contained in the various investigative materials is necessarily included in the Official Reports. There has been and is no police rule, regulation, procedure or practice that specifically required all exculpatory information learned in a criminal investigation to be placed in Official Reports and transmitted to Central Records. Nor was or is there any satisfactory procedure for monitoring whether in fact all exculpatory information is transmitted to Central Records through Official Reports.

12. Officers of the Department do not charge a person with commission of a violent felony except with approval of the State's Attorney's Office, a procedure known as "felony review." At the felony review stage and at various other times before trial of a person charged with a violent felony, it has been and is the practice of Department to have officers meet with Assistant State's Attorneys to prepare a case for trial.

13. Before institution of this action both County Defendants and Assistant State's Attorneys engaged in the felony review procedure were aware that Department detectives investigating violent felony cases prepared and used documents of the kind

encompassed within Finding 7(a)'s definition of Unofficial Reports. Awareness of that practice was established by substantial testimony during the hearings. However, evidence during the hearings was insufficient to prove County Defendants' awareness of the city-wide existence of street files as such.

14. Discovery efforts by criminal defendants in the Circuit Court of Cook County take two forms (either or both of which may be availed of by any defendant):

(a) subpoenas directed to Department and

(b) discovery motions served on County Defendants and other members of the State's Attorney's Office.

Before institution of this action neither the existence of street files nor the separate maintenance (apart from Official Reports) of other potentially exculpatory materials was a matter of public knowledge, so that counsel for criminal defendants were wholly unaware of any need to draft requests for subpoenas and discovery motions broadly enough to encompass documents not contained with the Official Reports.

15. Before institution of this action Department and members of the State's Attorney's Office responded to discovery efforts by criminal defendants in the following manner (even though the language of a subpoena or motion may have been broad enough—such as a reference to "any and all" documents—to encompass Unofficial Reports and other documents not given RD numbers, such as the types of documents referred to in Finding 10):

(a) In response to a defendant's subpoena, Department produced only the Official Reports maintained at Police Headquarters, 1121 South State Street, together with photographs and laboratory reports on analysis of physical evidence, and not (1) the Unofficial Reports maintained at Area detective facilities or in the possession of an individual detective

---

**6.** Plaintiffs' Prop. Findings 12.I and 12.J also refer to "discoverable" information and material, presumably adverting to items discoverable under Illinois Supreme Court Rule 412, Ill.Rev.

Stat. ch. 110A, § 412. But a violation of Rule 412 would not of itself implicate Section 1983, which is of course limited to infringement of *federal* rights.

or (2) the documents described in Finding 10 as not given RD numbers.

(b) In response to a defendant's discovery motion, trial assistants in the State's Attorney's Office simply ordered by telephone the Official Reports maintained at the Central Records Division. They made no effort to inquire of the individual detective Areas whether there were or had been investigative writings maintained there that were not included in the Official Reports. As for the documents described in Finding 10, (1) the information in crime lab files was neither revealed to nor produced for defendants during discovery unless an Assistant State's Attorney specifically requested that the crime lab write an official report incorporating its analysis and findings and (2) the other investigative reports were similarly neither revealed nor produced unless specifically requested by such an Assistant.

Department practice did not insure that the appropriate prosecutors would be informed of the existence of the undisclosed and unproduced documents, nor did the State's Attorney's Office's practices insure that they would make inquiry as to the possible existence of such documents. No Department procedure or regulation existed providing for the systematic retention or production of such documents even when they contained exculpatory material. These problems have not been corrected by any regularized procedures or requirements even today.

16. At the hearing plaintiffs established, by presenting Official and Unofficial Reports and other non-RD documents in 15 sample cases, that the exclusion of potentially exculpatory information from Official Reports was not a random or infrequent occurrence. Some examples were these:

(a) In *People v. Jones,* a death penalty case in which the existence of street files was first publicly revealed, a substantial amount of exculpatory information never found its way into the Official Reports (and was therefore not disclosed during discovery). Such exculpatory information included the contents of a detailed factual memo written by investigator Detective Frank Laverty, suggesting that the wrong man had been charged and stating a persuasive basis for that view (in fact the charges against Jones were ultimately dropped as entirely unfounded).

(b) In *In re Baker* the information contained only in Unofficial Reports consisted of an eyewitness identification of someone other than the defendant by a witness who knew the defendant, and who also told the investigators that the defendant was not present at the scene of the crime.

(c) In *People v. Williams* information in an unofficial "File Note" was followed by the notation:

"We did not put this in the supp. [Supplementary Report] because it would just cloud the issue."

Information omitted from the Official Reports consisted of an eyewitness description of persons apparently fleeing the crime scene—a description dissimilar to the descriptions given by the prosecution witnesses.

By the City's own admission, over 300 additional street files still exist at the various police Areas.

17. In response to Judge McMillen's issuance of the TRO in this action, Notice 82–2 prohibited destruction of documents "maintained and stored under Detective Division control within a unit." Department personnel applied that directive in an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not "under Detective Division control") and therefore as outside the preservation requirements of Notice 82–2. At the hearing Area Commanders Deas and Stibich testified that under their interpretation of Notice 82–2, and despite the language of the amended TRO in this action, detectives were still free to destroy their own investigative writings under the guise of "personal property."

18. Immediately following the testimony referred to in Finding 17, Superintendent Brzeczek (Department's chief executive and administrative officer) testified for defendants. Brzeczek's testimony was candid and forthright and substantially undercut the testimony of his subordinates referred to in Finding 17, and particularly their improper reading of Notice 82–2:

(a) Brzeczek specifically stated any failure to preserve *all* detective investigative documents (a concept that includes all items encompassed within Finding 7(a)) was improper.

(b) Brzeczek also testified his interpretation of the TRO and the intent of Notice 82–2 (which was a major step taken to implement the TRO, and was intended to have the identical scope) was that *all* investigative documents become part of the investigative file and must be preserved.

(c) Brzeczek further testified Notice 82–2 did away with any distinction between personal and departmental files, so that any detective who fails to retain any notes, or who retains any notes outside of Department's files, violates the TRO and Notice 82–2.[7]

(d) Brzeczek stated any failure to implement Notice 82–2 in the manner described in this Finding would be a violation of its provisions, and he had been unaware of any contrary views or action within Department. To his knowledge, though there had been earlier discussion of compliance with Notice 82–2 being an "overwhelming task," there was no indication it had posed any burden in practice.

(e) Brzeczek confirmed that any police recordkeeping system that did not effectuate both the Illinois Supreme Court Rules as to criminal case discovery and the constitutional principles exemplified by *Brady v. Maryland* was "flawed."

(f) Brzeczek stated Department had issued no directives as to the reasons for issuing Notice 82–2, nor had there been any changes in Department's manuals to comply with the TRO (though such matters were under consideration).

(g) Finally Brzeczek stated the entire problem of street files and the preservation of investigative documents was Department's responsibility. All such documents were to be turned over by Department in response to document requests, whether emanating from criminal defendants or from the State's Attorney's Office, after which the remaining responsibility was that of the latter.

Because Superintendent Brzeczek's testimony (binding on City Defendants) effectively conceded the propriety of the injunctive relief sought by plaintiffs, it appeared to this Court (and the parties appeared to agree) a consent decree was likely to be capable of development and, if so, would be the most expeditious way to proceed. Accordingly, the hearing was recessed so that proposals and counter-proposals could be submitted by all parties.[8]

19. Upon resumption of hearings after the recess had failed to produce a consent decree, City Defendants presented no additional evidence, and County called Deputy State's Attorney Kunkle. Kunkle's testimony supported that of Superintendent Brzeczek and basically confirmed the pro-

---

**7.** By the same token, any Department supervisory personnel who had or were aware of the kind of improper reading of Notice 82–2 referred to in Finding 17, and who failed to cause all notes and other investigative documents to be retained as part of Department's files, have also violated the TRO and Notice 82–2.

**8.** Initially such proposals were submitted both by plaintiffs and by City Defendants, with the latter's proposals incorporating part of the relief requested by plaintiffs. After this Court had provided all parties with a suggested synthesis of the parties' proposals, City Defendants' counsel originally indicated a number of the suggested revisions were acceptable to their clients. Then City Defendants essentially changed their position by rejecting any form of consent. By contrast, County Defendants have accepted a substantial portion of the relief relevant to them as proposed by plaintiffs and synthesized by this Court. Absent consent by all parties, however, this Court was compelled to resume hearings January 3, 1983.

priety of the injunctive relief sought by plaintiffs:

(a) Kunkle agreed all police investigative documents should be maintained for discovery purposes. Kunkle also testified an order requiring such maintenance in a specific location, together with a checklist identifying such documents as they are made or entered in the file, would substantially assist the State's Attorney's office in meeting its constitutional discovery obligations.

(b) Kunkle also confirmed it was the State's Attorney's office's responsibility under the Constitution and the Illinois rules as to discovery (1) to keep itself informed of the method and location of file-keeping by Department and (2) to assure the proper flow of any exculpatory materials in such files to criminal defendants. Accordingly Kunkle testified an order requiring the State's Attorney's office to maintain such knowledge as to Department, and requiring Department to inform the State's Attorney's office of any changes in Department's methods, would be appropriate and would impose no burden on the State's Attorney's office.

(c) Finally Kunkle testified the current methods employed by the State's Attorney's office to obtain files kept at the police Area facilities are limited to a phone call to administrative personnel at the Area facility and a discussion with the Chief Investigator before trial. No follow-up of that informal process is undertaken, nor is any check made of Department's responses to the Assistant State's Attorney's questioning.

Because of the variations that now exist in file-keeping methods and locations (both from Area facility to Area facility and from case to case), the procedure referred to in Finding 19(c) does not satisfactorily assure that any exculpatory material is produced at all, or is produced at a time sufficiently in advance of trial to be useful to the defendant.[9]

20. On February 3, 1983 Department issued Detective Division Special Order 83–1 ("Special Order 83–1"), dealing with the subject matter of this action. Special Order 83–1 (Exhibit 1 to these Findings and Conclusions) implements a number of the proposals made by City Defendants following Superintendent Brzeczek's testimony, together with some modifications that had then been suggested by this Court and were initially indicated by City Defendants to be acceptable revisions (see n. 8). Special Order 83–1 is substantially deficient, however, in the following respects: [10]

(a) To avoid any possible confusion on this score, the term "street files" should be added to Paragraph I ("Introduction") as one of the previously-existing common designations of investigative documents and files.

(b) Paragraph V.A. fails to provide for immediate initiation of an Investigative File Case Folder in *all* violent crime field investigations. As that paragraph is now

---

**9.** After Kunkle's testimony was completed plaintiffs stated they planned to introduce no rebuttal evidence. County Defendants some time later tendered their Group Ex. 1, a series of affidavits by Assistant State's Attorneys as to their alleged practices and procedures (including assertions as to some cases that had been the subject of plaintiffs' proof during the hearings). Plaintiffs have objected to those affidavits, stating "cross-examination would prove many of the assertions false as well as, explaining them in a way consistent with Plaintiffs' assertions in this lawsuit" (Pl. Jan. 19, 1983 Mem. at 3). County Defendants dispute that vigorously as well as making the technical argument (which this Court rejects) that plaintiffs' objections should not be considered at all

because filed five days late. In the view this Court takes of the case, the disputed affidavits would not affect the result even if plaintiffs' objections (which appear to have some validity) were overruled and the affidavits were fully credited.

**10.** As n. 8 reflects, before issuing Special Order 83–1 City Defendants had shifted ground on the entire subject of their acting voluntarily in this lawsuit to protect the constitutional rights of the plaintiff subclasses. Some of the matters next itemized in the text were things to which City Defendants had agreed before that basic rejection of any consented-to action on their part.

drafted, crimes other than those designated in Paragraph V.A.1 will not require the initiation of an Investigative File unless and until someone is arrested and felony charges are approved. That would mean all the controls intended to be established by this whole Investigative File procedure would be lacking in those cases until the arrest and the approval of felony charges. That would continue to pose the very risks of violations of constitutional rights this lawsuit was brought to prevent. There would be nothing to protect against the kind of selective retention referred to in Finding 8 and other Findings. Accordingly Paragraph V.A.1 must be revised, and corresponding changes will be required in Paragraphs V.A.2 and 4 and B.3.

(c) Nothing in Paragraph V.B. defines (as it should) the necessity for detectives to *record* all relevant investigative information, for precisely the reasons already discussed in these Findings. Consequently the following new Paragraph V.B.1 should be inserted (renumbering the present subparagraphs accordingly):

in line with the investigator's obligations to record and preserve all relevant information as fully and accurately as possible, take and maintain complete notes of all relevant matters during the course of their investigation (this requirement is intended to serve the purposes of Department directives to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that the accused may ultimately be granted access to any information and materials that may tend to show his possible innocence or aid in his defense).

(d) To avoid confusion created by the language of present Paragraph V.B.2, it should be revised to begin:

promptly (normally at the end of each tour of duty) submit all handwritten notes and investigative documents. . . .

(e) Although Department may have intended to imply such a duty by including the words "or received" in present Paragraphs V.B.2 and B.3, Special Order 83–1 omits an explicit statement of the nature initially proposed by City Defendants themselves as a proper means for implementing the preservation of defendants' constitutional rights. Such a provision (the following language is taken verbatim from City Defendants' original proposal) must be added:

Any detective who has or receives information relating to a violent crime field investigation not assigned to him will promptly forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder.

(f) Special Order 83–1 also omits any provision defining Department's duties in response to defendants' discovery efforts (again City Defendants' own proposals had recognized the need for such a provision).

Although Special Order 83–1 itself may not be the appropriate vehicle for including provisions as to training, City Defendants must also be required to implement a program of instruction to assure detectives' awareness of the reasons for, and the procedures regarding, the protection of the criminal defendants' rights referred to in these Findings and Conclusions. This too had been part of City Defendants' initial proposals from which they later backed away. Finally, nothing in Special Order 83–1 addresses the problem posed by the situation described in Findings 10 and 15.

*Conclusions of Law ("Conclusions")*

1. This Court has jurisdiction of this action under Section 1983 and 28 U.S.C. § 1331.

■ 2. This is a proper action for maintenance as a class action under Rule 23(b)(2) for the following reasons:

(a) Members of each of Subclass A and Subclass B are so numerous that joinder

of all members is impracticable (Rule 23(a)(1)).

(b) As shown by the Findings and these Conclusions, there are many questions of law and fact common to each subclass and to the class as a whole (Rule 23(a)(2)).

(c) As shown by the Findings, the claims of the representative parties are typical of the claims of the respective subclasses (Rule 23(a)(3)).

(d) Plaintiffs' counsel are experienced practitioners, both in the areas of criminal substantive and procedural law and in class actions. In this action both they and the representative parties have admirably protected the interests of each subclass, and they will continue fairly and adequately to protect those interests (Rule 23(a)(4)).

(e) Defendants, as the parties opposing the class, have both acted and refused to act on grounds generally applicable to the class. Accordingly this preliminary injunction and final injunctive relief are entirely appropriate with respect to the class as a whole (Rule 23(b)(2)).

3. Our Court of Appeals has regularly repeated the standards applicable to the grant or denial of preliminary injunctive relief. In accordance with the priority as defined in *O'Connor v. Board of Education,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981), the Court has most recently restated the standards in *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 681 (7th Cir. 1983):

> [I]n order to justify the district court's exercise of discretion in issuing the preliminary injunction, the plaintiff must show: "(1) it has at least a reasonable likelihood of success on the merits, (2) it has no adequate remedy at law and will otherwise be irreparably harmed, (3) the threatened injury to it outweighs the threatened harm the preliminary injunction may cause the defendants, and (4) the granting of the preliminary injunction will not disserve the public interest."

These Conclusions will address the factors in that sequence.

4. Plaintiffs have demonstrated far more than a reasonable likelihood of success on the merits:

(a) Department's practices before this action was instituted (see Findings 7–16) unquestionably created a grave risk of non-disclosure of exculpatory materials and hence of the violation of constitutional rights of members of Subclasses A and B. Despite Judge McMillen's issuance of the TRO and Department's conforming issuance of Notice 82–2, those practices and the corresponding risks have continued to exist.

(b) Department's most recent issuance of Special Order 83–1, though a step in the right direction, does not accord plaintiffs the full rights to which they are entitled. None of defendants disputes the entitlement of the class members to the substantive protection involved—their quarrel is rather with the need for injunctive relief to assure that protection.

5. Plaintiffs have also established the existence of irreparable damage and the inadequacy of remedies at law. Only by assuring the availability of exculpatory material for production (upon any reasonable request therefor) can the constitutional rights of class members be protected. Under the circumstances disclosed during the hearings, injunctive relief is necessary for that purpose:

(a) Even after Judge McMillen's issuance of the TRO and Department's conforming issuance of Notice 82–2, both line and supervisory personnel in Department engaged in distorted readings of those orders in a manner that would continue to thwart their purposes of making the constitutionally required disclosures to criminal defendants (see Finding 17). Then despite Superintendent Brzeczek's forthright testimony that should have caused City Defendants to confess error and consent promptly to issuance of an appropriate injunction (see Finding 18),

they have refused to do so. It is clear that without such an injunction criminal defendants will continue to be subject to the discretion of Department personnel who have effectively rebutted the presumption that public officials, once aware of the requirements of law, will comply with them.

(b) Although County Defendants have not been shown to have colluded with City Defendants in the violations of constitutional rights of class members (both those demonstrated in the past and those that would continue in the future absent injunctive relief), the preservation of such constitutional rights depends on the effective interaction of Assistant State's Attorneys with Department personnel. In at least some instances such Assistant State's Attorneys have not acted to assure full and proper disclosure to criminal defendants despite their knowledge of Department personnel's practices (see Finding 13). Past experience demonstrates it cannot be assumed that the knowledge and intentions of top-level personnel in the State's Attorney's office will also be effectively communicated to and acted upon by the Assistant State's Attorneys who have the responsibility for implementation of basic policies in real world terms. Kunkle's own testimony (see Finding 19) confirmed that an order of the nature being issued by this Court would be useful in that respect in assuring the preservation of constitutional rights that are the subject of this action.

6. Without question the harm to plaintiffs if a preliminary injunction were not issued (see Conclusion 5) would outweigh the harm to defendants if a preliminary injunction were wrongfully issued, for on defendants' own uncontroverted evidence no such harm would exist at all in the latter case. City Defendants' basic argument is that *they* should be permitted to tailor the means to arrive at concededly proper and constitutionally required goals, without being directed to do so by this Court—an argument demonstrating no harm whatever from such issuance. County Defendants have acknowledged issuance of an order would be helpful and not harmful.

7. Finally the preliminary injunction clearly would not disserve the public interest. Of course preservation of individuals' constitutional rights affirmatively serves the public interest. And as for the arguments advanced by defendants against interference with state criminal procedures, that is a wholly false issue. Nothing in this Court's order would in any way affect state criminal procedures, either at trial or post-conviction. All this Court's order will do is to assure that any exculpatory material will be preserved and therefore readily available, so that the *state* judicial remedies will go forward with the availability to defendants of what the Constitution requires. This Court is not second guessing or preempting the state court system in any respect.

\* \* \*

These Findings and Conclusions are accompanied by a suggested form of preliminary injunction order. Each of the parties is ordered to submit comments on the suggested order (including proposals for modifications or additions) on or before April 11, 1983. In addition, as the parties will note, the suggested order is silent on the subject of security, required by Rule 65(c) to be addressed by this Court, because of the assumption that the present security arrangements for the TRO would be appropriate for the preliminary injunction, or that the absence of potential harm to defendants is such that they would waive the giving of security altogether. This subject of security should also be addressed in the parties' comments (including a statement of the reasons that other security is necessary, and the appropriate amount thereof, if this Court has misread defendants' position in that respect).

EXHIBIT 1

| | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|
| DETECTIVE DIVISION SPECIAL ORDER NO. 83–1 | 13 January 1983 | 3 February 1983 | 83–1 |

| SUBJECT | DISTRI-BUTION | AMENDS |
|---|---|---|
| INVESTIGATIVE FILES | | |

| RELATED DIRECTIVES | RESCINDS |
|---|---|
| | |

## I. INTRODUCTION

This order is designed to institutionalize the control of all violent crime field investigation documents and files, which previously may have been referred to as working files, running files or detective's personal files and notes.

This order also provides for the maintenance and preservation of these documents by Detective Division field units.

## II. PURPOSE

This order provides:

A. guidelines for the proper retention of official Department reports, notes, memoranda and miscellaneous documents of potential evidentiary value accumulated during the course of a particular violent crime field investigation.

B. guidelines for the proper preparation of a supplementary report.

C. for the proper maintenance of Investigative Files and "R.D." numerical sequence files at the unit level by Detective Division personnel assigned to violent crime field investigations.

D. specific instructions for the development and proper assemblage of all documents placed into a violent crime Investigative File.

E. instructions for the inventory of all documents placed into an Investigative File Case Folder.

F. guidelines to Violent Crimes Unit supervisors for the proper maintenance, storage and retention of Investigative Files.

G. instructions for the use of the Investigative File Case Folder.

H. instructions for the use of the Miscellaneous Document Repository.

I. instructions for the use of the General Progress Report (CPD–23.122).

J. instructions for the use of the Investigative File Inventory Sheet (CPD–23.121).

## III. POLICY

It is the policy of the Chicago Police Department to conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during the subject investigation, initial court hearing or any subsequent reviews. Additionally, it is the policy of the Chicago Police Department to record and preserve *any* relevant information obtained by *any* detective during the course of a violent crime field investigation.

When assigned to violent crime field investigations, detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved.

Deviation from this policy adversely impacts on the goals and objectives of the Chicago Police Department and may result in disciplinary action against that Department member.

## IV. DEFINITIONS

### A. Investigative File

An Investigative File is a criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated by or received by any detective during the course of such investigation. This investigative file is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney and the assigned Department members with a comprehensive account of the subject criminal case.

### B. Investigative File Case Folder

An Investigative File Case Folder is an 8½" × 11" case folder complete with two (2) two-hole metal punch fasteners designed to secure all documents relating to the subject criminal case.

### C. Miscellaneous Document Repository

A Miscellaneous Document Repository is an 8½" × 11" envelope which will be utilized as a receptacle for all items and documents which are not 8½" × 11" in size. This envelope will be fastened with a two-prong metal fastener to the right hand side of the Investigative File Case Folder. It will be the first (bottom) document on the right hand side.

### D. Investigative File Inventory Sheet

An Investigative File Inventory Sheet is a multi-lined 8½" × 11" sheet of paper with columns to identify each investigative document that is placed in the investigative file case folder. This form functions as the case index for all documents within the investigative file case folder.

### D. A copy of the form will be forwarded to the Records Division whenever felony charges are placed against a person(s) to ensure proper notice of all existing documents pertaining to the subject investigation can be made to the State's Attorney's Office, the courts and the defense counsel.

### E. General Progress Report

A General Progress Report is a Department form, 8½" × 11" in size, which will be utilized by all detectives assigned to violent crime field investigations. This document is designed to standardize the recording of handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation.

## V. RESPONSIBILITIES AND PROCEDURES

A. The Violent Crimes Unit supervisors will ensure that:

1. an Investigative File Case Folder is initiated immediately in all violent crime field investigations listed below:

   a. Homicides/Medical Examiner Cases

   b. Police-related shooting incidents

   c. Batteries likely to result in death

   d. Rapes and Deviate Sexual Assaults

   e. Any other major violent crime field investigation that the unit supervisor deems appropriate.

2. an Investigative File Case Folder is initiated for all violent crime field investigations which culminate with the arrest of the offender(s) and the approval of felony charges.

3. all submitted documents are reviewed and inserted into the Investigative File Case Folder and logged on the Investigative File Inventory Sheet when an Investigative File Case Folder exists.

4. in those cases wherein an Investigative File Case Folder has not been prepared, all submitted documents presented with each supplementary report are reviewed and that those documents are attached to the photocopy of the original case report in the unit's R.D. numerical sequence file.

B.  Detectives are required to:

1.  transcribe relevant information which initially had been recorded upon General Progress Reports, Violent Crimes Major Incident Worksheets, and other miscellaneous investigative documents, on an official Department case report form (Supplementary, General Offense, etc.) consistent with the Detective Division Violent Crime reporting format.

2.  submit all handwritten notes and investigative documents generated or received to the unit supervisor for review and inclusion in the Investigative File Case Folder whenever an Investigative File Case Folder *has been* initiated.  (Normally at the end of each tour.)

3.  preserve all handwritten notes and investigative documents generated or received and submit them to the unit supervisor with each supplementary report submitted whenever an Investigative File Case Folder *has not been* initiated.

4.  assume responsibility for the contents of the investigative file folder and any documents placed within the folder during his tour of duty.

Whenever a member of the Division removes the Investigative File Case Folder from the Watch Commander's office, the member will, in accordance with Detective Division Notice No. 82–2, "Detective Division File Control Log," sign the unit File Control Log book.  The Unit File Control Log will also be signed by the member returning the Investigative File Case Folder.  The Investigative File Case Folder will not be handed over to another Division member without recording this exchange in the File Control Log book.

C.  The Violent Crimes Unit commanding officer will ensure that:

1.  the proper maintenance of the unit's R.D. numerical sequence files and direct administrative control of all Investigative File Case Folders are achieved.

2.  a copy of the completed Investigative File Inventory Sheet is forwarded to the Records Division whenever a violent crime

field investigation results in a person(s) being charged with a felony.

3.  all related documents, except original copies of supplementary case reports, are retained in unit files.

4.  all notes, memoranda and miscellaneous documents of potential evidentiary value are retained in the Violent Crimes Unit's Investigative Files.

## VI.  VIOLENT CRIMES FILE RETENTION

The retention schedule for Violent Crimes Units' files is as follows:

A.  Non-criminal incidents:  One (1) year—Purged

B.  Cleared Misdemeanor incidents:  One (1) year—Purged

C.  Unfounded incidents:  One (1) year—Purged

D.  Exceptionally Cleared incidents:  One (1) year—Purged

E.  Suspended incidents (except when warrants have been issued):

1.  Misdemeanors:  18 months—Purged

2.  Felonies:  Three (3) years—Purged

F.  Cleared Felony:  Until final court disposition—Purged

G.  Cleared/Closed Homicides:  Until final court disposition and then forwarded to Records Division for permanent retention.

H.  Unsolved Homicides:  Ten (10) years at Violent Crimes Unit and then forwarded to Records Division for permanent retention.

I.  Cleared/Open Homicides:  Ten (10) years at Violent Crimes Unit and then forwarded to Records Division for permanent retention.

/s/ William Hanhardt
William Hanhardt, Chief
Detective Division

## ORDER[1]

This Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclu-

---

1.  In response to this Court's March 31, 1983 order embodying the Findings and Conclusions, the parties have submitted comments on the proposed form of order that accompanied the

sions") dated March 31, 1983 have been entered in accordance with Fed.R.Civ.P. ("Rule") 52(a). Those Findings and Conclusions represent the reasons for the issuance of this Order. In accordance with Rule 65(d), it is ordered that pending a hearing on the ultimate merits of this litigation:

1. "City Defendants" (City of Chicago, Superintendent of Police Richard Brzeczek and Detective Division Area Two Commander Milton Deas) shall forthwith, and shall forthwith cause their officers, agents, servants, employees, attorneys and persons in active concert or participation with any of them to, modify Special Order 83–1 in the following respects:

(a) by adding the term "street files" to Paragraph I ("Introduction") as one of the previously-existing common designations of investigative documents and files;

(b) by revising Paragraph V.A. to require immediate initiation of an Investigative File Case Folder in *all* violent crime field investigations;

(c) by inserting the following new Paragraph V.B.1 (renumbering the present subparagraphs accordingly):

in line with the investigator's obligations to record and preserve all relevant information[2] as fully and accurately as possible, take and maintain complete notes of all relevant matters during the course of their investigation (this requirement is intended to serve the purposes of Department directives to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that the accused may ultimately be granted access to any information and materials that may tend to show his possible innocence or aid in his defense).

(d) by revising the language of present Paragraph V.B.2 to begin:

promptly (normally at the end of each tour of duty) submit all handwritten notes and investigative documents. . . .

(e) by inserting a provision to the following effect in an appropriate place in Paragraph V.B.:

Any detective who has or receives information relating to a violent crime field investigation not assigned to him will promptly forward the information to the assigned detective for investigation and inclusion in the Investigative File Case Folder.

---

March 31 order. Comments by counsel for City Defendants reflect both (a) a niggling approach to what are after all fundamental constitutional concerns and (b) an extraordinarily poor understanding of the fundamentals of drafting. In view of those infirmities, it can only be hoped that their *client*, the new Superintendent of Police, displays the same forthrightness and supportiveness of the principles dealt with by this Court that now-resigned Superintendent Brzeczek did (see Finding 18). Because City Defendants' comments do not merit individual attention, only n. 2 treats with a particularly indefensible aspect of their submission. As for County Defendants, their comments ignore (a) the pervasive problems engendered by the previously existing practices, (b) the fact that various of the Assistant State's Attorneys have in fact been aware of the practices and have not acted to cure them, and (c) most important, that to rid the present system of the constitutionally flawed practices "root and branch" (to import a phrase from another area of constitutional law) requires action by both sets of defendants working in cooperation. As matters now stand either set can frustrate the constitutional rights of defendants, and the provisions of Paragraph 4 of this order represent only minimal requirements that County Defendants' own Deputy State's Attorney Kunkle confirmed would be helpful (see Finding 19 and Conclusion 5(b)). Again it is disingenuous of counsel for County Defendants (as in the case of City Defendants' counsel) to disavow what their clients have been forthright enough to acknowledge. For all these reasons, this order follows the original proposed form in all substantive respects.

**2.** Ironically City Defendants complain of the use of the term "relevant information," though it was their own personnel that testified the proper (and only meaningful) criterion to define the obligation of their investigators was to record and preserve all information relevant to the investigation. That represented a limitation sought by City Defendants and their counsel in response to plaintiffs' efforts to impose an obligation to record and preserve *any and all* matters ascertained during investigation. City Defendants' counsel will not now be permitted to shift gears, given the stated constitutionally-directed purposes of this order.

(f) by inserting the following provision in an appropriate place in Paragraph V.B.:

Whenever a subpoena or discovery motion is received in any case, two copies of the Investigative File Inventory Sheet will be forwarded to the Office of Legal Affairs of the Department in the case of a subpoena, or to the Criminal Division of the Office of the State's Attorney in the case of a discovery motion, so that one of such copies may be transmitted to the attorney for the defendant.

2. City Defendants shall also promptly issue such directives and take such other action as may be required to assure that each Investigative File Inventory Sheet in any case that results in arrest and the approval of felony charges shall be supplemented, immediately upon such approval, by a complete list of all types of investigative and other police reports not given the RD number associated with the case, so that the copy transmitted to defendant's attorney as provided in Paragraph 1(f) of this Order will contain that information as well.

3. City Defendants shall also promptly issue such directives and take such other action as may be required to assure that Department's Training Division will develop a program of instruction designed to inform Detective Division personnel of (a) revised procedures relative to the initiation and maintenance of Investigative Files and (b) the underlying reasons for those procedures, including the need to preserve information obtained during investigations to protect the rights of prospective defendants.

4. Cook County State's Attorney Richard M. Daley shall promptly issue such directives and take such other action as may be required to assure that all Assistant State's Attorneys shall:

(a) maintain familiarity with the Chicago Police Department system (including any changes from time to time) for filing and maintaining police writings in criminal cases that the State's Attorney's Office is prosecuting;

(b) upon being advised of a discovery motion, or upon the filing of any "answer to discovery" in anticipation of such a motion, in connection with any contemplated or pending criminal prosecution, obtain all police files and records from the various divisions of the Chicago Police Department that have such documentation, and obtain all additional such documentation as it is subsequently generated;

(c) provide the defendant with the Investigative File Inventory Sheet where it exists in any pending criminal prosecution and where a discovery motion has been filed or an "answer to discovery" has been filed in anticipation of such a motion;

(d) upon any request for documents pursuant to discovery motion or upon the filing of any "answer to discovery" in anticipation of such a motion, provide the defendant with all police writings that are discoverable and notice of the existence of others that the State's Attorney claims are not;

(e) compare all files or notes produced by detectives at felony review, preliminary hearings, pretrial workups and trial with materials in the State's Attorney's file to assure that no police writings have been withheld from the State's Attorney's Office.

5. Rule 65(c) literally requires a bond in conjunction with every preliminary injunction. Two factors militate against requiring a bond here:

(a) Representative plaintiffs for the two subclasses are indigent. Our Court of Appeals has taught "Indigence is such a circumstance [for excusing bond]." *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 567 F.2d 692, 701 (7th Cir.1977) and cases cited.

(b) Defendants have demonstrated no potential damages to be suffered by them if they were held to have been wrongfully enjoined.

Accordingly bond is excused, and this preliminary injunction is issued without security.

6. This Court reserves judgment on plaintiffs' suggestion that a master be appointed to "monitor detective division operations and communications with the State's Attorney's Office during some test period, and provide the Court with an independent evaluation of reporting and disclosure problems under the current system." If defendants' performance under this order were to continue to reflect the same attitudes and conduct that were identified in the Findings and Conclusions, such an appointment might be in order. For the present this Court will give defendants the benefit of the assumption they will comply with alacrity and good faith with their duties to assure the constitutional rights of criminal defendants.